IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION

ROGER D. JOHNSON,                          :        Case No. 1:12CV2944

      Plaintiff,                       :

v.                                         :

COMMISSIONER OF SOCIAL SECURITY,           :        MAGISTRATE'S REPORT AND
                                                    RECOMMENDATION
      Defendant.                       :

## I.  INTRODUCTION.

This case was automatically referred to the undersigned Magistrate Judge for report and recommendation pursuant to the LOCAL CIVIL RULE 72.2(b) of the UNTIED STATES DISTRICT COURT, NORTHERN DISTRICT OF OHIO.  Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i).  Pending are the parties' Briefs on the Merits (Docket Nos. 12 and 15).  For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision.

## II. FACTUAL AND PROCEDURAL BACKGROUNDS FOR THE FIRST APPLICATION.

On May 23, 2005, Plaintiff filed an application for DIB alleging that he became unable to work because of his disabling condition on September 28, 2004 (Tr. 62-64).  The application was denied initially on August 31, 2005 (Tr. 53-55) and upon reconsideration on December 27, 2005 (Tr. 45-47).  Plaintiff fil  ed a request for hearing on January 9, 2006 (Tr. 42).  On April 16, 2008, Plaintiff, represented by counsel, Medical Expert (ME) Gottfried Spring, M.D., and Vocational Expert (VE) Evelyn Sindelar, appeared and testified before Administrative Law Judge (ALJ) Peter Beekman (Tr. 302-322).  Upon consideration of the legal standards for review and the entire record, the ALJ issued an adverse decision on May 2, 2008, advising that Plaintiff was capable of performing past relevant work as a laser beam cutter and therefore, he was not disabled (Tr. 12-18).

Under the rules, regulations and rulings in effect as of the date the Appeals Council took no action for the reasons that there was no error of law, the ALJ had not abused his discretion, the ALJ's decision was supported by substantial evidence and there was no new and material evidence that convinced the Council that the decision was contrary to the weight of all the evidence in the record.  Accordingly, on September 18, 2008, the Appeals Council denied Plaintiff's request for review (Tr. 5-7).

On October 28, 2009, United States Magistrate Judge William H. Baughman, Jr., reversed and remanded the decision denying Plaintiff's application for DIB to the Commissioner for reconsideration of Plaintiff's residual functional capacity, with proper consideration of the medical source opinions of Dr. Cheng and the State agency reviewing psychologists (Tr. 370-378).

Consistent with Magistrate Judge Baughman's decision, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ for further proceedings on

2

December 4, 2009 (Tr. 367).

### III. FACTUAL AND PROCEDURAL BACKGROUNDS FOR THE SECOND APPLICATION.

On August 7, 2008, Plaintiff completed a second application for DIB, alleging that he became unable to work because of his disabling condition on September 28, 2004 (Tr. 436, 438-439).  This application was pending when the Appeals Council ordered the first remand and on December 4, 2009, the Appeals Council found that Plaintiff's claim for Title II benefits filed on August 1, 2008, was considered a "subsequent claim duplicate."  The ALJ was ordered to associate the "subsequent claim duplicate" with the remand hearing and issue a new decision on the associated claim (Tr. 367).

### IV. THE FIRST REMAND HEARING.

Pursuant to the order of the Appeals Council, Plaintiff, represented by counsel, VE Kevin Yi and ME Hershel Goren, M.D., a neurologist, appeared and testified before ALJ Beekman on March 29, 2010 (Tr. 420, 550).

#### A. PLAINTIFF'S TESTIMONY

The following summation of Plaintiff's testimony is limited to facts that he did not present in the first hearing:

1. He had been sober since November 6, 1979 (Tr. 554).

2. During an average day, he rose at noon, ate something, watched television, talked to his family on the telephone, took a shower, if he could, and then watched more television.  Plaintiff's girlfriend assisted him sporadically with his hygiene, occasionally cooked and cleaned.  Plaintiff did very little housework because of his painful back (Tr. 554-555, 557, 558).

3. Plaintiff spent an inordinate amount of time napping.

4. During his last job, he lifted items that weighed from 75 to 80 pounds.  Now the heaviest he could lift was 10 pounds.  In fact, lifting more gave him the sensation of

3

pin prinks (Tr. 555, 557, 560).

5.      Plaintiff saw his "regular" physician bimonthly.

6.      Plaintiff now took antidepressants and the side effects were drowsiness, lethargy, dry mouth and tinnitus.  Plaintiff explained that depression affected his ability to concentrate and/or comprehend what he watched on television (Tr. 556, 558, 561).

7.      In 1990 or 1995, Plaintiff sustained a head injury when he raised up and hit the back of his head on a machine (Tr. 556).

8.      Plaintiff's back pain was ongoing and the back of his legs hurt.  His neck felt like glass crunching (Tr. 556-557).

9.      Lifting his left upper extremity was painful (Tr. 559).

10.     Standing more than 20 minutes affected him to the extent that he could not be seated. Plaintiff estimated that he could "be on his feet" for an hour and one half, if the act of standing were spread out (Tr. 560, 561).

11.     Since being unemployed, Plaintiff gained 80 pounds (Tr. 561).

**B.      THE ME'S TESTIMONY**.

Describing Plaintiff's severe impairments, the ME listed the following problems:

1.      Left shoulder.

2.      Major depressive disorder (MDD).

3.      Post traumatic stress disorder (PTSD).

4.      Pain disorder associated with psychological factors and a general medical condition for which Listing 12.07 is applicable.

5.      A past problem with alcohol abuse; however, it was the ME's opinion that the alcohol abuse was not material to this case (Tr. 562).

The ME explained that if Plaintiff lifted no more than ten pounds below the shoulder and could not reach overhead, Dr. Cheng's surgery was totally a failure.  Dr. Cheng's notes do not reflect

4

that the surgery was a failure. Nor had Dr. Cheng recommended or performed corrective surgery or ordered further diagnostic testing (Tr. 563).

The ME's assessment of Plaintiff's residual functional capacity consists of the ability to:

1.     Lift or carry 20 pounds occasionally.

2.     Lift or carry 10 pounds frequently.

3.     Not lift overhead, push or pull.

4.     Not lift overhead or reach.

5.     Never climb using a ladder, rope or scaffold.

6.     Engage in superficial interpersonal interaction with supervisors, co-workers and the general public, but exclude arbitration negotiation, confrontation, supervision of others, and the responsibility for the safety or welfare of others.

7.     Engage in unconstrained walking (Tr. 563, 564).

The ME further commented that the term "degenerative disc disease" is a radiographic finding. It has no clinical correlation. The pain disorder with psychological factors did not factor into the residual functional capacity (Tr. 567, 569). Finally, the ME noted that his independent opinion about Plaintiff's mental restrictions was consistent with the reading of opinions by Drs. Felker and Fisher and that his independent opinions about the physical restrictions were consistent with the evidential record of Dr. Cheng (Tr. 568).

C.     THE VE'S TESTIMONY

The VE described Plaintiff's past relevant work as a laser operator in a steel factory described in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a publication of the United States Department of Labor that provides a picture of the workforce, the tasks to be performed and the skills that must be achieved, as a semiskilled job with a medium exertion level. The VE further assigned Plaintiff's job a specific vocational preparation (SVP) score of five. A score of five

suggests that it would take more than six months up to and including one year to learn the techniques, acquire the information and develop the facility needed for average performance of this laser operator job.

Finally, the VE explained that Plaintiff's past job of a laser operator was fairly new to DOT and that it was a specific skilled job; accordingly, there were few skills acquired while performing this job that would be transferrable to other jobs (Tr. 570).

### 1. THE FIRST HYPOTHETICAL.

The VE was asked to consider a hypothetical male, age 53 years, with Plaintiff's work experience and the following abilities:

> To lift and carry 20 pounds occasionally and ten pounds frequently; to stand and walk six out of eight hours as well as sit for six out of eight hours; to push/pull limited on the left to no overhead but this does not preclude push/pull parallel to the ground or at an angle below parallel; to have unlimited use of the foot pedal bilaterally; to frequently use a ramp or stairs but never use ladders, ropes or scaffolds; to frequently balance, stoop, kneel, crouch, but never crawl; not reach overhead with the left but he could frequently do so with the right; and to reach bilaterally parallel to the ground or below.  The ALJ added that this hypothetical male had bilateral vision and no limitations in his ability to speak and hear, he should avoid extreme cold and unprotected heights; and engage in no work involving arbitration, negotiation, or confrontation, no supervision, no health safety or welfare of another party, and that he should have only superficial interpersonal interactions with the public, co-workers and supervisors (Tr. 570).

The VE opined that this hypothetical individual could perform a number of jobs at the light exertional level for which the number of jobs available nationwide and in the State of Ohio are:

| JOB & DOT | NUMBER OF JOBS NATIONWIDE AND IN THE STATE OF OHIO |
|---|---|
| Small product assembler 706.684-022 | 1.5 million 75,000 |
| Cafeteria attendant 311.677-010 | 150,000 5,000 |
| Mail clerk 209.687-026 | 60,000 2,500 |

6

(Tr. 571-572).

2.      **THE SECOND HYPOTHETICAL.**

The ALJ posed a scenario that was identical to the terms of the first hypothetical except that this hypothetical individual can do some complex tasks frequently and that the task must be low stress, no high production quotas and no piece rate work.  The VE explained that this hypothetical individual could still perform work as a mail clerk and cafeteria attendant.   In addition, the hypothetical individual could perform the following:

| JOB & DOT | NUMBER OF JOBS NATIONWIDE & IN THE STATE OF OHIO |
|---|---|
| Car wash attendant 915.667-010 | 600,000 2,500 |

(Tr. 572).

3.      **THE THIRD HYPOTHETICAL.**

Counsel asked if the VE would include all of the limitations and/or restrictions from the first hypothetical question and add a limitation that the hypothetical worker would have a permanent restriction of lifting ten pounds with the left arm.  The VE explained that the DOT did not address whether it is bilateral or one handed but from his experience, the hypothetical individual would not be able to do medium exertion level jobs because it requires one hand up to fifty pounds.  In the first hypothetical the ALJ only referred to twenty pounds.  So assuming that the hypothetical individual could still use his or her dominant hand to lift twenty pounds, the hypothetical individual could do light work with restrictions to the left hand up to ten pounds.  The VE reiterated that the hypothetical individual with one arm could do light work (Tr. 573-574).

**4.** **THE FOURTH HYPOTHETICAL**.

Counsel asked the VE to add to the first hypothetical that, there was an expectation that the hypothetical individual would be off task 20% of the time due to pain and depression.  The VE explained that there would be no competitive full-time employment that the hypothetical individual could perform (Tr. 574).

**D.** **THE ALJ'S DECISION**.

Social Security regulations mandate that the question of whether or not a claimant is disabled is an administrative issue reserved to the Commissioner.  Administrative regulations require that the Commissioner comply with the following legal standard for assessing disability.

**1.** **THE LEGAL STANDARD FOR DISABILITY**.

Under the Act, a social security claimant may be entitled to receive DIB because he or she is under a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

In determining whether or not a social security claimant is disabled the ALJ must apply the five-step sequential evaluation process established under Section 404.1520 of the regulations.

First, a social security claimant must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant

a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). The social security plaintiff bears the burden at the first four steps of the process. *Id.* The Commissioner bears the burden of the sequential process at step five. *Id.* If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

**2. THE ALJ'S DECISION.**

Considering the legal standard of disability set forth above and the evidence in the record, on April 30, 2010, the ALJ associated the August 7, 2008 claim file with the initial filings and made the following findings of fact and conclusions of law:

1. Plaintiff met the insured status requirements of the Act on September 28, 2004 and he continued to meet those requirements through December 31, 2010.

2. Plaintiff had not engaged in substantial gainful activity since September 28, 2004.

3. Plaintiff had severe impairments, namely status post left shoulder dislocation reduced in September 2004 and status post rotator cuff tear in the left shoulder, surgically

treated in October 2004; psychological factors and a medical condition with depressive symptoms noted, MDD, PTSD and alcohol abuse, episodic. Plaintiff does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C. F. R.  Part 404, Subpart P, Appendix 1.

4.      After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity to perform light work subject to the following exertional and non-exertional limitations:

Plaintiff could lift and carry 20 pounds occasionally and ten pounds frequently; to stand/ walk six out of eight hours as well as sit for six out of eight hours; he was unable to push and pull overhead on the left but he could push/pull parallel to the ground or below parallel on the left.  Plaintiff had unlimited ability to push/pull on the right as well as unlimited bilateral ability to operate foot pedals.  From a non-exertional standpoint, Plaintiff could frequently use a ramp or stairs but never ladders, ropes or scaffolds; he could frequently balance, stoop, kneel, crouch, but never crawl.  He was unable to perform overhead reaching with the left upper extremity but he could frequently do so with his dominant right hand.  Plaintiff had no limitations in vision, speaking or hearing but he should avoid extreme cold and unprotected heights.  From the mental standpoint, Plaintiff was unable to work in an environment that involved arbitration, negotiation, or confrontation with others, no supervision of others or the responsibility for the health safety or welfare of others.  Plaintiff was also limited to superficial interpersonal interactions with the public, co-workers and supervisors.

5.      Plaintiff was unable to perform his past relevant work.

6.      Considering Plaintiff's age, education and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

7.      Plaintiff was not under a disability as defined in the Act from September 28, 2004 through April 30, 2010 (Tr. 351-363).

**E.      THE DECISION OF THE APPEALS COUNCIL.**

On September 22, 2010, the Appeals Council remanded the case to the Commissioner with

instructions to:

1.      Assign the case to another ALJ.

10

2.     Conduct a more complete evaluation of the evidence.

3.     Determine the merits of the mental work-related limitations in the residual functional capacity as described by State agency reviewing psychologists David J. Dietz, Ph. D., and Michael Wagner, Ph. D., and assign specific weight to their opinions.

4.     Consider the treating source opinions of Dr. Stephen Cheng, M. D., and determine the weight to be assigned such opinions.

5.     Consider the opinion of ME Hershel Goren, M. D., and determine the weight to be assigned such opinions.

6.     Consider all treating and non-examining opinions in the file and evaluate them pursuant to 20 C. F. R. § 404.1527 and SSR 96-2p, 96-5p and 96-6p.

7.     Re-evaluate Plaintiff's mental impairments and to that end, obtain a new consultative mental status examination with psychological testing and a medical source statement and obtain supplemental testimony from a ME if needed.

8.     Offer the Plaintiff the opportunity for hearing and take any further action necessary to complete the administrative record and issue a new decision (Tr. 346-347).

## V. THE SECOND REMAND HEARING.

Pursuant to the Appeals Council's order, on June 1, 2011, an administrative hearing was convened at which Plaintiff, represented by counsel and VE Thomas Nimberger appeared and testified before ALJ Dennis LeBlanc.

### A.     PLAINTIFF'S SUPPLEMENTAL TESTIMONY

Plaintiff received a pension of $1,098 per month.  He contributed to his insurance and his former employer paid the rest of the premium (Tr. 522).  Plaintiff lived in a house that his parents had owned.  The house had been in foreclosure but Plaintiff's brother helped him retrieve the house from foreclosure.  Occasionally his girlfriend lived with him.  His brother and his girlfriend's son helped with chores such as cleaning the yard and vacuuming (Tr. 519, 520).

Plaintiff explained that after his accident, he attempted to return to work as a laser operator but was given the wrong physical examination.  The corporate office would not permit him to return

11

to work (Tr. 520-521, 523). By the time of the third hearing, Plaintiff had not worked or even looked for work since leaving his job as a laser operator (Tr. 520, 522).

Recently, Plaintiff was diagnosed with a stress disorder by his psychologist (Tr. 542). Over the past five years, Plaintiff had headaches twice a week that could last for an entire day (Tr. 530). Plaintiff had a chronic dull pain in his left shoulder that continued to increase in intensity. Lifting over his head aggravated the pain in his shoulder. When he walked "any distance" he experienced stabbing pain in his back which in turn, radiated down his leg (Tr. 524, 527, 582). Occasionally Plaintiff felt a tingling in his legs or they would "go numb" (Tr. 525). In addition, his sciatic nerve would also occasionally "go out" (Tr. 526).

With respect to functional activities, Plaintiff explained that sitting too long also exacerbated his back pain (Tr. 529). During the six hours he spent watching television daily, Plaintiff had to alternate between lying down, standing and sitting (Tr. 535). However, standing for more than fifteen minutes to wash dishes precipitated back pain (Tr. 536). Plaintiff estimated that at the outside, he could not stand more than a half hour. With his uninjured hand, however, he could lift approximately twenty-five pounds (Tr. 534-535; 541).

Plaintiff could not concentrate for prolonged time periods as this caused sleepiness (Tr. 537). When he left his home, it was to go to the supermarket, the park, eat at a restaurant or visit his family (Tr. 538). Plaintiff admitted that he had difficulty interacting with people because of their different points of views and their inability to move at his pace (Tr. 538, 539).

Plaintiff self medicated and occasionally drank alcohol. He was prescribed Vicodin for pain and he took up to three dosages daily depending on the severity of his pain. The only reported side effect of the Vicodin was constipation (Tr. 529, 531). Plaintiff tried various dosages of medications prescribed to regulate his depression. Because his insurance would not cover the drug Celexa, Dr.

12

Cogan provided samples.  The symptoms of depression were anhedonia and general unhappiness (Tr. 532, 533).

**B.     THE VE'S TESTIMONY**.

Describing Plaintiff's employment history over the past 15 years, the VE considered that the job of laser beam cutter was coded in DOT at 815.682-010.  It was light work as normally performed and semiskilled with an SVP level of more than three months and up to and including six months (Tr. 543).

**1.     THE FIRST HYPOTHETICAL.**

The VE was asked to consider the following:

An individual the same age, education and work experience as Plaintiff, who would be able to lift and carry 20 pounds occasionally; ten pounds frequently; stand and/or walk six hours in an eight- hour day; would be occasionally able to climb ramps and stairs, but no ladders, ropes or scaffolds; occasional stooping, kneeling, crouching, but no crawling.  Further assume the hypothetical individual would be able to frequently reach with their non-dominant upper extremity; no limitation with their dominant upper extremity; would be limited to occasional overhead reaching with their non-dominant upper extremity.  Would need to avoid hazards, such as dangerous machinery or unprotected heights; able to understand, remember and carry out non-detailed two to three-step instructions; perform routine and repetitive tasks but not any fast paced production environments, such as in an assembly line; and interaction with co-workers would be superficial in nature and he or she would not be required to interact with the general public no more than occasional basis, meaning no more than a third of the workday (Tr. 545).

The VE responded that the following unskilled jobs performed at the light level of exertion exist in the national or regional economies that the hypothetical individual could perform:

| JOB & DOT | NUMBER OF JOBS IN THE LOCAL AND NATIONAL ECONOMIES |
|---|---|
| Packager 559.687-074 | 800 and 88,000 |
| Mail clerk 209.687-026 | 850 and 95,000 |

| Cafeteria attendant<br>323.687-014 | 890 and 92,000+ |
|---|---|

(Tr. 546, 547).

### 2.    THE SECOND HYPOTHETICAL.

Counsel posed a question asking that if the individual were limited to lifting ten pounds with the non-dominant upper extremity, would that make a difference?  The VE explained that it would since light work does allow someone to lift 20 pounds and many of the jobs are only lifting five. In fact, it would reduce the numbers of available jobs by at least ten to fifteen percent (Tr. 547).

### C.    THE ALJ'S DECISION.

After careful consideration of the entire record, the ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff last met the insured status requirements of the Act on December 31, 2010.

2.    Plaintiff had not engaged in substantial gainful activity since September 28, 2004.

3.    Plaintiff had severe impairments, namely, an impaired left shoulder, degenerative disc disease, MDD and PTSD.  However, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R.  Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity to perform light work subject to the following exertional and non-exertional limitations:

> Plaintiff could lift and carry 20 pounds occasionally and ten pounds frequently; he could sit, stand or walk for six hours of an eight-hour workday.  While he could occasionally climb ramps, stairs, stoop, kneel and crouch, he could never crawl or climb ladders, ropes or scaffolds.  While he could perform frequent reaching with his non-dominant upper extremity, he could only perform occasional overhead reaching with his non-dominant upper extremity.  He had no limitations with his dominant upper extremity.  He must also avoid hazards such as unprotected height and dangerous machinery. In terms of his mental limitations, Plaintiff could understand,

14

remember, and carry out non-detailed, two to three-step instructions and perform routine, repetitive tasks in a non-fast paced production environment, like an assembly line.  He was also limited to only superficial contact with co-workers and occasional interaction with the public.

5.  Through the date last insured, Plaintiff was unable to perform his past relevant work.

6.  Considering Plaintiff's age, education and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform.

7.  Plaintiff was not under a disability as defined in the Act from September 28, 2004 through April 30, 2010 (Tr. 333-343).

**D.  THE APPEALS COUNCIL.**

The Appeals Council found no reason to assume jurisdiction and on September 28, 2012, issued a decision in which it determined that the preceding ALJ's decision was the final decision of Commissioner of Social Security after remand by the Court (Docket No. 1, Exhibit A).

**E.  JUDICIAL REVIEW**

Within 60 days, Plaintiff filed a Complaint in this Court seeking judicial review of the Commissioner's final decision (Docket No. 1).

**VI. THE MEDICAL EVIDENCE.**

**A.  PHYSICAL IMPAIRMENTS.**

**1.  KAISER PERMANENTE® OF OHIO/CLEVELAND CLINIC FOUNDATION.**

On November 4, 1998, a plate of steel fell on Plaintiff's hands causing his right small finger to be hyper-extended and abducted.  X-rays of the right fifth finger showed a fracture with a spike extending proximally and the main shaft fragment with a spike projecting distally into the fossa (Tr. 212).  Initially a splint was placed on the little finger of the right hand (Tr. 197).  On November 28,

1998 and February 24, 1999, the general surgeon, Dr. James Walker, M. D., noted the continued presence of edema and a decreased range of motion in the injured finger (Tr. 190, 194).

X-rays of Plaintiff's right knee taken on May 21, 2003, showed no evidence of fracture, lesion or radiographic abnormality.  There was, however, evidence of mild patellofemoral degenerative changes (Tr. 215).

Plaintiff sustained a left rotator cuff injury which was confirmed by the magnetic resonance imaging (MRI) performed on October 15, 2004.  Specifically, the results from the MRI showed no soft tissue injury, bone abnormality, fracture or dislocation; however, the presence of a partial tear could not be excluded (Tr. 142, 143, 144).  Contemplating that he would undergo surgery to repair the tear, Plaintiff underwent a pre-admission consultation during which it was recommended that to promote his recovery, Plaintiff perform home exercises/strengthening program and refrain from working until December 22, 2004 (Tr. 132-137).

Dr. Stephen Cheng, M. D., the orthopedic surgeon, conducted a number of follow up visits with Plaintiff during which he evaluated the body mechanics and monitored the intake of narcotic pain relievers.  As expected Plaintiff was in a lot of pain shortly after the surgery on October 19, 2004 (Tr. 186-187).  Thereafter, Plaintiff reported some improvement in the intensity and severity of the pain on November 3, 2004 and November 22, 2004 (Tr. 174-175; 183-185).  On December 10, 2004, there was improvement to the extent that a request was made for physical therapy. Plaintiff explained that the intensity and severity of his pain were steadily decreasing (Tr. 171-174).

Dr. Cheng recommended that Plaintiff "may not work from January 15 to February 20, 2005 (Tr. 169).  On January 18, 2005, Dr. Cheng noted that the intensity and severity of pain were decreasing.  Lifting more than two pounds and overhead lifting on the left were contraindicated (Tr. 166-167).  Dr. Cheng recommended that Plaintiff " not work from February 21 to March 28, 2005

16

(Tr. 166).  The pain appeared to stabilize as of February 15, 2005 and on April 19, 2005, Dr. Cheng released Plaintiff to return to work on April 29, 2005 through June 15, 2005 with the following modifications:

1.   No lifting greater than 5 pounds below shoulder level.

2.   No lifting above shoulder level (Tr. 161, 162, 163).

During the follow-up visit on May 4, 2005, Dr. Cheng described the pain as dull; however, the pain was "getting better" (Tr. 157).  By June 1, 2005, Plaintiff was sleeping well and the pain fluctuated.  Dr. Cheng released Plaintiff to work from June 15, 2005 through August 11, 2005, subject to the following limitations:

1.   No lifting greater than five pounds below shoulder level.

2.   No lifting using the left arm (Tr. 151-154).

On September 14, 2005, Dr. Cheng affirmed that Plaintiff could return to work but reminded Plaintiff that he had a permanent restriction in his shoulder to the extent that he should avoid lifting more than ten pounds with the left arm below the shoulder level only and that he should avoid overhead activities (Tr. 261, 262).

2.   CLEVELAND CLINIC HEALTH SYSTEM, EUCLID HOSPITAL.

On September 25, 2004, Plaintiff presented to the emergency room after falling off a ladder, hitting his left shoulder on the ground and injuring his hand.  Plaintiff denied any neck, back, abdominal, chest or leg pain (Tr. 217, 221).  The chemical and hematological tests showed an elevated glucose level, an elevated MPV level and a low calcium level (Tr. 225, 226).  The computed tomography (CT) scan of Plaintiff's head was unremarkable (Tr. 227).  The X-ray showed:

a.   Left shoulder anterior dislocation of the left humeral head and satisfactory reduction of an anterior dislocation of the left shoulder.

17

      b.       Left humerus   anterior dislocation of the head.

      c.       Chest       normal (Tr. 228, 229, 230).

**3.**      **THE PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT**.

Based on the diagnoses of left shoulder dislocation and rotator cuff tear, Dr. Jerry W. McCloud, M. D., opined that Plaintiff had no environmental, communicative or visual limitations resulting therefrom.  Effective August 10, 2005, Plaintiff was limited to:

      a.       Occasionally lifting and/or carrying fifty pounds.

      b.       Frequently lifting and/or carrying twenty-five pounds.

      c.       Standing and/or walking about six hours in an eight-hour workday.

      d.       Sitting about six hours in an eight-hour workday.

      e.       Pushing and/or pulling on an unlimited basis.

      f.       Occasionally climbing using a ladder/rope/scaffold.

      g.       Reaching on a limited basis (Tr. 236-239).

**4.**      **DR. LEONARD BRZOZOWSKI, M. D., A SURGEON**,

Dr. Brzozowski conducted a consultative examination on December 18, 2006, after which he recommended the removal of Plaintiff's gallbladder to resolve symptomatic gallstones (Tr. 287). On January 9, 2007, Dr. Brzozowski performed the surgery and on January 25, 2007, the pathology showed no evidence of malignancy.  In fact, Plaintiff had no complaints and he was doing well since the removal of his gallbladder (Tr. 292, 295).

**5.**      **DR. DAVID P. COGAN, M.D.**

Dr. Cogan, an internal medicine specialist, conducted a series of examinations after Plaintiff dislocated his shoulder.  On November 7, 2006, he ordered a lipid profile and a test which checks

for problems with electrical activity in the heart over a period of time.  From the blood collected on November 8, 2006, there was evidence of an elevated level of triglycerides (Tr. 284).  Results from the electrocardiography examination showed a normal heart rhythm (Tr. 281, 282, 283, 284, 288, www.healthgrades.com/phsyician/dr-david-cogan-xlypv).

On December 5, 2006, Dr. Cogan focused on whether Plaintiff was taking his Lisinopril, a medication used to treat hypertension (Tr. 279).

On December 7, 2006, Plaintiff underwent an ultrasound of the right upper abdominal quadrant. The evaluation was limited by body habitus; however, the evidence showed possible non-obstructive kidney stones (Tr. 287).

Dr. Cogan ordered a complete blood count and the results from samples collected on May 21, 2007, showing:

a.  Elevated MPV;

b.  Lower than normal red blood count;

c.  Lower than normal hemoglobin count;

d.  Lower than normal hematocrit level;

e.  Lower than normal MCHC (Tr. 271, 273, 283).

Plaintiff presented on June 5, 2007, for a gastric biopsy.  The results showed chronic inactive gastritis and a possible esophageal ulcer (Tr. 286).

Dr. Cogan found an irregularity in the back of the tear of the rim around that socket in the shoulder with evidence for associated fracture fragment and loose body within axillary recess.  On July 27, 2007, he opined that these findings suggested remote posterior dislocation with associated fracture (Tr. 268, 269).

Plaintiff was treated on April 21, 2008 for shoulder pain and symptoms of gastroesophageal

reflux disease (GERD) (Tr. 479, 481, 482).

On July 22, 2008, the radiographic examination of Plaintiff's cervical spine showed evidence of  discogenic degenerative disease but no evidence of dislocation or fracture.  The radiographic examination of Plaintiff's lumbar spine showed evidence of multilevel discogenic degenerative disease but no evidence of subluxation or fracture (Tr. 480, 483, 484).

Plaintiff was treated for a urinary tract infection on November 21, 2008 (Tr. 476).

On June 3, 2009, the pain medication was refilled and Plaintiff was treated for the symptoms of GERD.  Routine chemistry and hematological tests showed elevated levels of uric acid and low levels of MCHC (Tr. 474A, 490, 491).

On June 9, 2009, a sore on Plaintiff's left upper arm was treated (Tr. 474).

On May 20, 2011, Dr. Cogan completed a PSYCHOLOGICAL QUESTIONNAIRE dated, on which he noted that he did see many patients in practice with mental health issues and that Plaintiff:

    a.      Had shoulder/back/knee arthritis.

    b.      Had periodic depression and anxiety but he had daily pain and stiffness.

    c.      Was prescribed an antidepressant and with its use, there was some improvement.

    d.      Was unable to sustain work for an eight-hour work day, five days per week.

    e.      Experienced symptoms that were severe enough to interfere with the attention and concentration necessary to perform simple tasks.

    f.      Experienced chronic irritability and mood swings.

    g.      Was unable to deal with work pressures.

    h.      Could not sustain work in a competitive environment.

    i.      Could stand for 5-10 minutes and walk for 10-15 minutes.

    j.      Could lift ten pounds.

     k.       Would need to take unscheduled breaks during the eight-hour work day at least every 30 minutes and at least ten minute breaks.

     l.       Would probably be absent ten days a month due to chronic, severe pain (Tr. 510, 511, 512, 513).

### 6.    Dr. Judith Adamich, M. D., Euclid Health Center.

Plaintiff presented on February 15, 2010, with pain in his neck, back and left shoulder as well as a cough, sweats, chills and body aches.  Dr. Adamich diagnosed Plaintiff with influenza and discussed with Dr. Cogan the use of an intramuscular anti-inflammatory drug to treat the pain (Tr. 486-487).

### B.    Psychological and mental evaluations.

### 1.    Dr. Kenneth R. Felker, Ph.D., psychologist.

A clinical interview was conducted on July 6, 2005 during which Dr. Felker noted that Plaintiff  claimed he was depressed, he was oriented for person, time and place and his insight and judgment were fair.  Plaintiff explained that his day generally entailed watching television, visiting his father in a nursing home and reading (Tr. 232-233).  Based on the information gathered from this assessment, Dr. Felker made the following observations:

     a.       Plaintiff showed mild impairment in his ability to concentrate and attend to tasks.

     b.       Plaintiff's ability to understand and follow instructions was not impaired; however, the capacity for executing tasks was judged to be moderately restricted because of depressive symptoms and chronic pain.

     c.       Plaintiff's ability to relate to others and deal with the public showed evidence of mild to moderate impairment.

Dr. Felker categorized Plaintiff's mental disorders and synchronized them with the American Psychiatric Association's standard criteria of the classification of mental disorders published in the Diagnostic and Statistical Manual of Mental Disorders, a five-axis model designed to

provide a comprehensive diagnosis that includes a complete picture of not just acute symptoms but of the entire scope of factors that account for a patient's mental health:

| AXIS | WHAT THE MULTI-AXIAL SYSTEM MEASURES | DR. FELKER'S FINDING |
|---|---|---|
| I | All diagnostic categories except mental retardation and personality disorder | Chronic pain disorder with psychological factors and a medical condition (depressive symptoms noted) and alcohol abuse (episodic) |
| II | Personality disorders and mental retardation | No diagnosis |
| III | General medical condition, acute medical conditions and physical disorders | Chronic pain disorder and alcohol abuse |
| IV | Psychosocial and environmental factors contributing to the disorder | Unemployment, financial restrictions, physical problems, death of his daughter. |
| V | Global Assessment of functioning (GAF) or the numeric scale that this mental health clinician rates subjectively, Plaintiff's social, occupational and psychological functioning | Based on Plaintiff's showing moderate impairment in occupational functioning, Dr. Felker determined that Plaintiff had moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g. few friends, conflicts with peers or co-workers. |

Dr. Felker noted that Plaintiff was unmotivated and he exhibited a narrow range of interests, in part because of depression. Plaintiff admitted that during the past years, he had become socially withdrawn (Tr. 231-233).

### 2. DR. MICHAEL D. WAGNER, PH.D., A PSYCHOLOGIST.

Dr. Wagner completed both a MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT and a PSYCHIATRIC REVIEW TECHNIQUE form. The MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT is a summary conclusion derived from evidence in the file that tends to determine mental activity within the context of its limitation on the social security claimant's capacity to sustain activity over a normal workday and workweek on an ongoing basis. The PSYCHIATRIC REVIEW TECHNIQUE form requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.

a.    The MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Dr. Wagner's summary conclusions of the evidence did not suggest that Plaintiff had any marked limitations in understanding and memory, sustained concentration and persistence, social interaction and adaptation, derived from his impairment.   On August 20, 2005, Dr. Wagner concluded that Plaintiff had moderate limitations in the context of his capacity to sustain activity over the normal workday and work week in the following areas:

1.    The ability to carry out detailed instructions.

2.    The ability to maintain attention and concentration for extended periods.

3.    The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods.

4.    The ability to interact appropriately with the general public.

5.    The ability to respond appropriately to changes in the work setting (Tr. 243-244).

Dr. David Deitz, Ph. D., reviewed the evidence in the file and affirmed Dr. Wagner's findings on December 15, 2005 (Tr. 249).

b.    THE PSYCHIATRIC REVIEW TECHNIQUE EVALUATION.

Dr. Wagner opined that from September 8, 2004 to August 26, 2005, Plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic criteria, namely, a chronic pain disorder and episodic alcohol abuse (Tr. 253, 255).   The degree of functional limitations resulting from these impairments is:

| FUNCTIONAL LIMITATIONS | DEGREE OF LIMITATION |
|---|---|
| Restriction of activities of daily living | Mild |
| Difficulties in maintaining social functioning | Moderate |
| Difficulties in maintaining concentration, persistence or pace | Moderate |

23

| Episodes of decompensation, each of extended duration | None |

Dr. Wagner did not find any evidence to establish the "C" criteria of the Listing (Tr. 258).  Dr. Dietz

reviewed the evidence in the file and affirmed Dr. Wagner's assessment on December 16, 2005 (Tr.

247).

### 3.   DR. PHILLIP J. FISHER, M. D.

On January 20, 2010, Dr. Fisher conducted a psychiatric examination.  To compartmentalize

the features of Plaintiff's mental and physical status, Dr. Fisher used the DIAGNOSTIC AND

STATISTICAL MODEL OF MENTAL DISORDERS.  The results follow:

| Axis | Plaintiff's Diagnosis |
|---|---|
| I.  Clinical Disorders | MDD & PTSD, recurrent |
| II.  Personality Disorders and Intellectual Disabilities | Deferred |
| III.  General Medical Condition | Peptic ulcer, back and shoulder impairment |
| IV.  Psychosocial and environmental Disorders | Deferred |
| V.  GAF | 63 or some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. |

(Tr. 498-499).

### 4.   RICHARD C. HALAS, M. A., CLINICAL PSYCHOLOGIST.

Plaintiff was referred for "an individual psychological evaluation in order to determine his

current functioning levels to facilitate long term disability determination."  Based on observations

made during the interview conducted on February 1, 2011, Mr. Halas noted that Plaintiff had no

difficulty sitting, standing or walking and that his ability to lift, carry and handle objects was poor

and below average. Plaintiff had orthopedic problems with his lower extremities, his hearing was intact and his affect was flat and tearful at times (Tr. 504).

Using the DIAGNOSTIC AND STATISTICAL MODEL OF MENTAL DISORDERS' five-axis model, Mr. Halas provided his assessment of Plaintiff's mental and physical health:

| Axis I. Clinical Disorders | MDD, recurrent<br>Generalized anxiety disorder<br>Polysubstance abuse |
|---|---|
| II. Personality Disorders and Intellectual Disabilities | No diagnosis or condition |
| III. General Medical Condition | Deferred for medical examination |
| IV. Psychosocial and environmental Disorders | Psychosocial stressors include unemployment, financial concerns, health concerns and dependency on a friend with cancer. |
| V. GAF | Plaintiff's functional severity is 55 or evidence of moderate symptoms or moderate difficulty in social, occupational or school functioning. His overall GAF score is 45, a score that denotes some serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work). |

In the four-work related mental abilities, Ms. Halas found that:

a.      Plaintiff's mental ability to understand, remember and follow instructions was not impaired.

b.      Plaintiff's mental ability to maintain attention and concentration to perform simple, repetitive tasks was mildly impaired.

c.      Plaintiff's mental ability to relate to others, including fellow workers and supervisors showed marked impairment due to symptoms of depression and anxiety.

d.      Plaintiff's mental ability to withstand the stresses and pressures associated with most day-to-day work activities was markedly impaired.

e.      Plaintiff was unable to manage his funds in an appropriate practical and realistic manner (Tr. 504-505).

Mr. Halas expounded these findings in the MEDICAL SOURCE STATEMENT also completed

25

on February 1, 2011, where he opined that Plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting was markedly impaired.  Furthermore, Plaintiff could not be around crowds (Tr. 507).

## VII. JUDICIAL REVIEW.

The Act provides that any individual, after any final decision of the Commissioner of Social Security made after a hearing to which that individual was a party, may obtain review of such decision by a civil action.  42 U. S. C. § 405(g)(Thomson Reuters 2013).  The Magistrate will analyze the merits of Plaintiff's Complaint, considering all of the medical evidence, the pleadings of the parties and the decisions of the Commissioner.

### A.  THE LEGAL STANDARD OF JUDICIAL REVIEW.

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).  When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.*" Johnson v. Astrue,* 2010 WL 5559542, *3 (N. D. Ohio 2010) (*citing Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The reviewing court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id.* (*citing Walters*, *supra*, 127 F.3d at 528).

If the ALJ applied the correct legal standards and his or her findings are supported by substantial evidence in the record, his or her decision is conclusive and must be affirmed. *Id.* (*citing Warner v. Commissioner of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g)).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971) (*citing Consolidated Edison v. NLRB*, 59 S. Ct. 206, 217 (1938)).  The substantial evidence standard is intended to create a "zone of choice within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, it is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. *Id.* (*citing Crisp v. Secretary of Health & Human Services,* 790 F.2d 450, 453 n. 4 (6th Cir. 1986)).

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. *Id.* (*see Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) ("Although substantial evidence otherwise supports the decision of the Commissioner in this case, reversal is required because the agency failed to follow its own procedural regulation, and the regulation was intended to protect applicants like [plaintiff]."); *Id.* at 546 ("The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.' ") (*quoting* 5 U.S.C. § 706(2)(d) (2001)); *cf. Rogers*, 486 F.3d at 243 (holding that an ALJ's failure to follow a regulatory procedural requirement actually "denotes a lack of substantial evidence, even when the conclusion

of the ALJ may be justified based upon the record").  "It is an elemental principal of administrative law that agencies are bound to follow their own regulations," *Id.* (*citing Wilson*, *supra*, 378 F.3d at 545, and the Court therefore "cannot excuse the denial of a mandatory procedural protection . . . simply because there is sufficient evidence in the record" to support the Commissioner's ultimate disability determination.  *Id.* (*citing Wilson*, *supra*, 378 F. 3d at 546).  The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless.  *Id*. (*see Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) (finding that a party seeking to overturn an agency's administrative decision normally bears the burden of showing that an error was harmful)).

An ALJ's violation of the Social Security Administration's procedural rules is harmless and "will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses."  *Id.* at *4 (*citing Wilson*, *supra*, 378 F.3d at 546-47 (emphasis added) (*quoting Connor v. United States Civil Services Commissioner*, 721 F.2d 1054, 1056 (6th Cir. 1983)).  Thus, an ALJ's procedural error is harmless if his or her ultimate decision is supported by substantial evidence and the error did not deprive the claimant of an important benefit or safeguard.  *Id.* (*see Wilson, supra*, 378 F. 3d at 547 (holding that an ALJ's violation of the rules for evaluating the opinion of a treating medical source outlined in 20 C.F.R. § 404.1527(d) was a deprivation of an "important procedural safeguard" and therefore not a harmless error).  If a procedural error is not harmless, then it warrants reversing and remanding the Commissioner's disability determination.  *Id.* (*citing Blakley*, *supra*, 581 F.3d at 409) (stating that a procedural error, notwithstanding the existence of substantial evidence to support the ALJ's ultimate decision, requires that a reviewing court "reverse and remand unless the error is a harmless de minimis procedural violation").

B.    ANALYSIS OF THE ISSUES.

Plaintiff's argues that ALJ LeBlanc failed to comply with the directives of the Appeal's Council.  He presents eight reasons that this case should be again reversed and remanded.  First, the ALJ failed to consider Plaintiff's obesity.  Second, the ALJ failed to consider Plaintiff's medications in his decision.  Third, there is nothing in the residual functional capacity that addresses his degenerative disc disease.  Fourth, Plaintiff suggests that the ALJ incorrectly attributed too little weight to the opinions of Drs. Cheng and Cogan without appropriate explanation.  Fifth, the ALJ erred by failing to re-contact Dr. Cheng.  Sixth, the ALJ attributed too much weight to the opinions of Dr. Goren.  Seventh, the ALJ improperly analyzed the report of Mr. Halas.  Eighth, the ALJ improperly relied on the opinions of Michael Wagner.

1.    OBESITY.

Plaintiff maintains that the ALJ failed to fully evaluate his obesity as a severe impairment or provide any explanation as to how his obesity factored into the assessment of his residual functional capacity consistent with the Social Security Administration's policy concerning the evaluation of obesity in TITLES II AND XVI:  EVALUATION OF OBESITY, 2000 WL 628049, SSR 02-1p (September 12, 2002).

a.    THE LAW

Obesity is "a complex, chronic disease characterized by excessive accumulation of body fat." *Id.* at *2.  The National Institutes of Health has established guidelines for classification of overweight and obese adults in its CLINICAL GUIDELINES ON THE IDENTIFICATION, EVALUATION, AND TREATMENT OF OVERWEIGHT AND OBESITY IN ADULTS (CLINICAL GUIDELINES.  *Id.*

The CLINICAL GUIDELINES classify an overweight or obese individual based on that person's

Body Mass Index (BMI) (the ratio of an individual's weight in kilograms to the square of his or her height in meters).  *Id*.  Obesity is further divided by the CLINICAL GUIDELINES into three levels: Level I (BMI of 30.0–34.9); Level II (BMI of 35.0–39.9); and, Level III (BMI greater than or equal to 40.0).  *Id.*  For adults, the CLINICAL GUIDELINES describe a BMI of 25-29.9 as overweight and a BMI of 30.0 or above as "obesity."  *Id.*

In Title II and adult Title XVI cases, the ALJ will consider obesity in determining whether: the individual has a medically determinable impairment; the individual's impairment(s) is severe; the individual's impairment(s) meets or equals the requirements of a listed impairment in the listings; and the individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy.  *Id.* at *3.

The social security regulations require an ALJ to consider the effects of obesity as part of their adjudication of a claim for benefits at Steps Two through Five of the sequential evaluation process.  *Id.* When establishing the existence of obesity, the ALJ will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height.  *Id.*  In the absence of evidence to the contrary in the case record, the ALJ will accept a diagnosis of obesity given by a treating source or by a consultative examiner.  *Id.*  If there is evidence that indicates that the diagnosis is questionable and the evidence is inadequate to determine whether or not the individual is disabled, the Social Security Administration will contact the source for clarification, using the guidelines in 20 C. F. R.  404.1512(e) and 416.912(e).  *Id.*

Alternately, when the evidence in a case does not include a diagnosis of obesity, but the clinical notes or other medical records show consistently high body weight or BMI, the Social Security Administration may ask a medical source to clarify whether the individual has obesity.  *Id.* Even if a treating or examining source has not indicated a diagnosis of obesity, the ALJ will use his

30

or her judgment to establish the presence of obesity based on the medical findings and other evidence in the case record.  *Id.*

In most cases, the medical and other evidence in the case record will establish whether the individual has obesity.  *Id.* *4.  Generally, the Social Security Administration will not purchase a consultative examination just to establish the diagnosis of obesity.  *Id.*  Neither will the Social Security Administration purchase testing for measuring body fat.  *Id.*  The ALJ will consider the individual's weight in the record documented over time offset by minor, short-term weight loss.  *Id.* at *3 Consideration will be given to the whether the individual is obese as long as his or her weight or BMI shows essentially a consistent pattern of obesity.  *Id.*

**b.  THE APPLICATION**.

The ALJ's opinion does not explicitly indicate that he considered Plaintiff's weight.  Neither does he make reference to SSR 02-1p.  The Magistrate is not persuaded that in this case, Plaintiff's obesity should have been considered when evaluating the extent of Plaintiff's functional loss.

First, Plaintiff failed to present definitive evidence that his treating sources explicitly considered him obese.  Second, none of Plaintiff's treating sources measured or documented Plaintiff's BMI.  Second, SSR 02-1p requires Plaintiff to have another impairment of Listing-level severity in order for his obesity to be considered.  Plaintiff clearly does not have nor does he suggest if and how any of his impairments meet the Listing.  Specifically, Plaintiff has not demonstrated that the combined effect of obesity and his shoulder impairment or the combined effect of his obesity and the degenerative changes in his neck and spine can be greater than the effects of each of the impairments considered separately.  Third, none of the physicians who commented on Plaintiff's limitations indicated that a combination of impairments, including his obesity, imposed work related limitations, limitations in routine movements or necessary physical activity.  Fourth, the state agency

31

physician who reviewed Plaintiff's file concluded that Plaintiff could stand and/or walk about six hours in an eight-hour workday as well as sit about six hours in an eight-hour workday even given his weight.  Fifth, in all of the medical evidence, there is nothing to suggest that Plaintiff's obesity posed problems with the ability to sustain a function over time.  Sixth, Plaintiff did not testify that his obesity imposed any additional work related limitations.

The undersigned recognizes that at various times from 2004 to 2010, the clinical notes show that Plaintiff's weight varied from 282 pounds to 304 pounds (Tr. 221, 267, 271, 273, 275, 277, 278, 281, 474, 475, 477, 479, 481, 486 & 488).  Assuming *arguendo* that Plaintiff is obese, there is nothing to show that the combined effects of obesity with his other impairments may be greater than might be expected without obesity.  In light of Plaintiff's failure to provide medical evidence as outlined above, the Magistrate declines to find that ALJ's failure to conduct a detailed analysis of whether Plaintiff's obesity had a significant impact on his functional limitations or residual functional capacity, is reversible error.

### 2.    THE MEDICATIONS.

Plaintiff advises that he was taking various narcotic medications including Oxycodone, Vicodin and Tramadol, pursuant to round-the-clock treatment for pain.  The ALJ noted but failed to properly evaluate the dosages, effectiveness and side effects of these medications as required by 20 C. F. R. § 404.1529(c)(3)(iv).

### a.    THE LAW.

Consideration must be given to symptoms that sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone.

. . . .we will carefully consider any other information you may submit about your

symptoms.  The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or non-treating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled.  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or non-treating source, and observations by our employees and other persons.  Section 404.1527 explains in detail how we consider and weigh treating source and other medical opinions about the nature and severity of your impairment(s) and any related symptoms, such as pain.  Factors relevant to your symptoms, such as pain, which we will consider include, *inter alia*, the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms.

20 C. F. R. § 404.1529 (c)(3)(iv) (Thomson Reuters 2013).

**b.**     **THE APPLICATION**.

The ALJ correctly acknowledged that after the fall, Plaintiff took a myriad of medications, including Oxycodone, Flexeril and Vicodin, for the treatment of pain.  Elsewhere in his decision, the ALJ noted that more recently, Plaintiff was not taking these medications and now he was prescribed a simple regimen which included Vicodin for pain and Celexa for symptoms of depression.  Plaintiff explained that he did not regularly take Vicodin; "sometimes I take three a day and sometimes I don't take any" (Tr. 529).  With the exception of constipation, he reported no significant side effects and it appeared that Plaintiff's pain was adequately controlled and/or stable. Similarly, his use of Celexa seemed to help the symptoms of depression "a little bit" (Tr. 532).  The sporadic use of Vicodin and the daily use Celexa does not suggest the presence of any symptom-related functional limitations and/or restrictions which should be taken into account when determining the presence of an impairment.  The ALJ's more limiting discussion of the medications

33

that Plaintiff took was adequate.

### 3.    RESIDUAL FUNCTIONAL CAPACITY.

Despite finding that Plaintiff had a severe impairment, namely, a degenerative disc disease, there is nothing in the ALJ's finding of residual functional capacity that reflects this impairment. Plaintiff contends that the residual functional capacity that fails to include this impairment is not based on substantial evidence.

### a.    THE LAW.

Residual functional capacity is what an individual can still do despite his or her limitations. TITLES II AND XVI:  ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, SSR 96-8p, *1 (July 2, 1996).  Under settled practice, residual functional capacity is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related physical and mental activities. *Id.* Ordinarily, residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  *Id.*  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Id.*

The adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis and describe the maximum amount of each work related activity the individual can perform based on the evidence in the record.  *Id.* Therefore, in assessing residual functional capacity, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments.  *Id.*

34

**b.** **THE APPLICATION.**

The undersigned finds  that the ALJ properly conducted the residual functional capacity analysis, basing it on all relevant evidence which included Plaintiff's description of the discogenic degenerative disc disease and the medical evidence that failed to show simple impingement, reflex loss or sensory loss resulting therefrom.  There was no allegation of physical limitation or restriction of specific functional capacity resulting from the back impairment and no information in the case record that there is such a limitation or restriction (Tr. 339).  Accordingly, the ALJ appropriately considered that Plaintiff did not have a limitation or restriction with respect to functional capacity.

**4.** **TREATING SOURCES**

Plaintiff's fourth claim is phrased in a manner that suggests Drs. Cheng and Cogan were both treating sources and to properly discount those opinions, the ALJ was required to give good reasons for the weight actually assigned to their opinions.

**a.** **THE LAW.**

When assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards.  *Blakley v. Commissioner, supra*, 581 F.3d at 406.  One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  *Id.* (*citing Wilson v. Commissioner, supra*, 378 F.3d at 544) (*quoting* 20 C.F.R. § 404.1527(d)(2)).  The ALJ "must" give a treating source opinion controlling weight if the treating source opinion is

35

"well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Id.* (*citing Wilson*, 378 F.3d at 544; (*quoting* 20 C.F.R. § 404.1527(d)(2)).

Conversely, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." *Id.* (*citing* SSR. 96-2p, 1996 WL 374188, at *2 (July 2, 1996)). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Id.* (*citing Wilson,* 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2)).

Closely associated with the treating physician rule, the regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the claimant's treating source's opinion. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* at 406-407 (*citing* SSR 96-2p, 1996 WL 374188, at *5). This procedural requirement exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has indicated that he or she is disabled and then an administrative agency decision is rendered indicating that he or she is not disabled. *Id.* (*citing Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999)). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's

application of the rule.  *Id.* (*citing Wilson*, 378 F.3d at 544).  Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," we have held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (*citing Rogers, supra*, 486 F.3d at 243 (emphasis added).

>    **b.**    **THE APPLICATION**.

The ALJ considered Dr. Cheng as a treating source (Tr. 338-339).  The ALJ explained that Dr. Cheng was an orthopedic surgeon who could provide a longitudinal picture of Plaintiff's rotator cuff tear, the surgery and the recovery.  After the surgery, Plaintiff's shoulder condition improved. The ALJ made it sufficiently specific that he gave some weight to Dr. Cheng's opinions but discounted his opinions to the extent that he attributed limitations to Plaintiff's dominant uninjured arm without medical support.

The Magistrate finds that upon careful review of the decision, the ALJ followed the procedural process of identifying the reasons for discounting the opinions and explaining precisely how those reasons affected the weight given.  The ALJ's decision leaves this Court with a clear understanding as to why and to what extent Dr. Cheng's opinions were discounted.

Similarly, the decision reads as though the ALJ considered Dr. Cogan a treating source.  The ALJ did not summarily reject Dr. Cogan's treatment notes but he appropriately discounted them based on his speciality, the nature and extent of his relationship with Plaintiff and the lack of supportability for his opinions.  The ALJ discounted Dr. Cogan's residual functional capacity finding because he only treated Plaintiff a couple of times annually beginning in 2004 through 2008; the nature and extent of his treatment were focused primarily on complaints of shoulder pain and

the occasional innocuous maladies such as a sore on his arm or having a urinary tract infection. There was no supportability for his opinions and the residual functional capacity was based in large part on Plaintiff's subjective complaints. There is a clear understanding as to why the ALJ discredited Dr. Cogan's physical limitations.

There is also a clear understanding as to why the ALJ did summarily discredit Dr. Cogan's psychological assessment. Dr. Cogan was an internal medicine specialist who represented in the PSYCHOLOGICAL QUESTIONNAIRE that he treated many patients for mental health issues. He did not, however, provide treatment notes of Plaintiff's mental health-related symptoms. In fact, Dr. Cogan never identified the evaluating aspects of a mental disorder or the objective medical evidence on which he based his diagnosis (Tr. 341).

The Magistrate cannot disturb the ALJ's treatment of Dr. Cogan's opinions as he followed the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given. Consequently, his decision to give little weight to Dr. Cogan's opinions in their entirety is supported by substantial evidence.

### 5. RE-CONTACT DR. CHENG.

Plaintiff argues that the ALJ inappropriately discounted Dr. Cheng's opinions because he gave no explanation for suggesting that Plaintiff avoid overhead activities with his dominant, uninjured arm (Tr. 341). Plaintiff suggests that if the ALJ was uncertain, he should have re-contacted Dr. Cheng for an explanation.

### a. THE LAW

Under 20 C. F. R. § 404.1512(e):

We will first re-contact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the

report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

**b.   THE APPLICATION.**

The ALJ had an affirmative duty to develop a complete medical history and to gather such information as may be necessary to render a disability decision. Dr. Cheng's medical records were complete; he just made a finding that was not supported by his own treatment notes and in conflict with Plaintiff's own testimony that with his uninjured right arm, he could lift approximately 25 pounds (Tr. 541). The Magistrate will not impose a duty to re-contact the treating physician for clarification because the ALJ was able to determine whether Plaintiff was disabled based upon existing evidence. Upon review of the medical evidence, there are no obvious gaps in the administrative record that would trigger a duty to re-contact. The ALJ possessed a complete medical history and he used his discretion to obtain the needed information quickly and efficiently in advance of rejecting a benefits claim.

**6.   THE MEDICAL EXPERT OPINION.**

Plaintiff argues that the ALJ erroneously accepted or relied upon the ME's testimony in making a decision. Plaintiff's argument is premised on the ME's criticism of Dr. Cheng's findings.

**a.   THE LAW.**

MEs are physicians, mental health professionals and other medical professionals who provide impartial expert opinion at the hearing level on claims under Title II and Title XVI of the Social Security Act by either testifying at a hearing (in person, by telephone, or by video

teleconference) or responding in writing to interrogatories.  I-2-5-32. MEDICAL EXPERTS - GENERAL, HALLEX I-2-5-32, 1994 WL 637369, *1 (September 28, 2005).  The need for ME opinion is left to the ALJ's discretion.

*Id.*

The primary reason an ALJ may obtain ME opinion is to gain information which will help him or her evaluate the medical evidence in a case, and determine whether the claimant is disabled or blind. *Id.*  When ME testimony is needed, use of an ME will result in a more complete record to support the ALJ's conclusion on the ultimate issue of disability.  *Id.*

The operations manual indicates that an ALJ "may need to obtain an ME's opinion" in the following circumstances:

- the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s);
- the ALJ is determining the usual dosage and effect of drugs and other forms of therapy;
- the ALJ is assessing a claimant's failure to follow prescribed treatment;
- the ALJ is determining the degree of severity of a claimant's physical or mental impairment;
- the ALJ has reasonable doubt about the adequacy of the medical record in a case, and believes that an ME may be able to suggest additional relevant evidence;
- the medical evidence is conflicting or confusing, and the ALJ believes an ME may be able to clarify and explain the evidence or help resolve a conflict;
- the significance of clinical or laboratory findings in the record is not clear, and the ALJ believes an ME may be able to explain the findings and assist the ALJ in assessing their clinical significance;
- the ALJ is determining the claimant's residual functional capacity, e.g., the ALJ may ask the ME to explain or clarify the claimant's functional limitations and abilities as established by the medical evidence of record;
- the ALJ has a question about the etiology or course of a disease and how it may affect the claimant's ability to engage in work activities at pertinent points in time, e.g., the ALJ may ask the ME to explain the nature of an impairment and identify any medically contraindicated activities; or
- the ALJ desires expert medical opinion regarding the onset of an impairment.  *Id.*

b.     THE APPLICATION.

The Magistrate concurs that at times, the ME's testimony was cryptic and on occasion, he appeared to be impatient (Tr. 565, 567, 569). Nevertheless, the Appeals Council ordered the VE to "consider the opinion of ME Hershel Goren, M. D., and determine the weight to be assigned such opinions." So the ALJ did not err by calling Dr. Goren to testify. Neither is there any indication in this record that the ALJ accepted or relied upon the objectionable portions of Dr. Goren's testimony or how he delivered the message.

Upon review of Dr. Goren's testimony, it is obvious that he thoroughly considered the allegations by Dr. Cheng which suggested that Plaintiff's shoulder impairment was progressive and therefore his assessment could be particularly confusing. The ME was called upon to resolve the inconsistency in Dr. Cheng's medical records which showed that the "shoulder" surgery was a success because he did not consider revision surgery or refer him to a specialist. Yet Dr. Cheng continued to show that Plaintiff had marked limitations in lifting with his uninjured arm/hand. The ME did not supplant Dr. Cheng's opinions; he merely filled in a gap and made a decision that was plainly premised upon the complete absence of objective medical evidence to support an exaggerated physical limitation. The ALJ's decision was plainly premised upon the ME's conclusions derived from the absence of objective medical evidence provided by Dr. Cheng.

The Magistrate is persuaded that the ALJ was doing exactly what he was instructed to do. Neither the hearing transcript nor the ALJ's decision reflect any unjustified reliance upon inaccurate testimony from the ME. There is no indication that the ME's testimony was limited in any significant manner by inconsistencies or inaccuracies. Of equal importance, the record evidence is ample to support the ME's determinations and other findings with respect to Plaintiff's impairments and his residual functional capacity, without regard to the objectionable portions of the ME's

testimony. For these reasons, the undersigned is not persuaded that the ALJ's reliance on the ME's testimony rises to the level of reversible error.

### 7. MR. HALAS' OPINION.

Plaintiff argues that the ALJ inappropriately discounted Mr. Halas opinion because his GAF score reflected that Plaintiff's level of functioning had significantly decreased in a year.

#### a. THE LAW

As stated above, GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from zero to 100, with lower scores indicating more severe mental limitations. *White v. Commissioner of Social Security*, 572 F.3d 272, 276 (6th Cir. 2009). GAF scores are a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. *Id.* It ranges from 100 (superior functioning) to one (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or a serious suicidal act with clear expectation of death). *Id.*

#### b. THE APPLICATION

A year prior to the hearing, Plaintiff 's GAF score was 63. A score of 63 is indicative of only mild dysfunction. After Mr. Halas conducted a clinical examination, he assigned Plaintiff a GAF of 45, a score suggesting serious dysfunction. While these scores are not dispositive of anything, the ALJ found an inconsistency between the scores, weighed the opinions and properly discounted Mr. Halas' assignment of a GAF score as it denoted a drop in the score significant to the extent that it elucidated Plaintiff's underlying mental issues. Because Mr. Halas' opinions were seriously at odds with Plaintiff's the other medical evidence, this finding suggested an alarming impairment which was not supported by the medical evidence. The ALJ weighed the evidence and did not err in according little weight to Mr. Halas' opinion of Plaintiff's GAF score.

8.     THE OPINION OF MICHAEL WAGNER

Plaintiff suggests that the ALJ should not have relied on the six-year-old opinion of Dr. Wagner. It was error to rely upon such outdated opinion while disregarding the opinions of the consultative examiner and Dr. Cogan, both of whose reports were more contemporaneous with the date of the hearing.     The answer to this dilemma lies simply in the power of the Appeals Council to initiate review during a remand hearing.  During the last remand hearing, the Appeals Council determined that the opinion of Dr. Wagner, Ph.D., was material to the substance of matters in dispute.  On remand, the ALJ was instructed to determine the merits of the mental work-related limitations in the residual functional capacity as described by State agency reviewing psychologist, Michael Wagner, Ph. D., and assign specific weight to his opinion (Tr. 346).

Inherent in the order remanding the case was that if the ALJ accorded significant weight to his opinion, he could rely on such opinion in assessing residual functional capacity.  Plaintiff has not demonstrated that the ALJ's decision reflects any unjustified reliance upon inaccurate testimony from Dr. Wagner or that Dr. Wagner's findings, albeit less recent, were not based on evidence in the record.  This analysis of Dr. Wagner's opinion was exclusive of the analysis of opinions by the more contemporaneous opinions rendered by the consultative examiner or Dr. Cogan.  The Magistrate does not find that the ALJ erred in considering Dr. Wagner's opinion or relying on such opinion.

## X. CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate.


/s/Vernelis K. Armstrong
United States Magistrate Judge

43

Date:   August 28, 2013

## XI. NOTICE

### XII. NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.